[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties herein were intermarried at Wallingford, Connecticut, on June 27, 1964. The plaintiff has resided in the State of Connecticut for at least twelve months next preceding the date of the filing of the complaint. There are currently no minor children issues of the marriage although there were four sons born during the marriage, all of whom have attained their age of majority. The marriage of the parties has broken down irretrievably.
This is a case where we have a marriage of 31 years but there is some problem with allocating the reason for the breakdown of the marriage. Based upon the plaintiff's testimony, she has been unhappy in the marital situation for a long number of years, but did nothing about it until just recently. At the time of the marriage, the plaintiff was 21 years of age and had one year of college in New Haven. The defendant was attending the University of Conn. and continued his education until he graduated and went to work for Aetna Insurance Co.
The plaintiff had a short period of employment as a secretary, also for Aetna Insurance Co. Originally the parties lived in an apartment in Wallingford and shortly after the marriage the plaintiff became pregnant with their first child. Prior to the birth of the child was when the plaintiff alleged her first indication of a problem with the defendant surfaced. It occurred when he was supposed to pick her up after work and bring her home. After waiting for an hour for the defendant, the plaintiff went to her mother-in-law's house and waited there for the defendant who showed up some time after 9:30 P.M. The defendant's excuse was that he was with some of his friends and forgot the time. The defendant on CT Page 12692 numerous occasions thereafter did not come home immediately after work and it became a problem for the plaintiff.
The defendant would go out drinking with his friends and would get home rather late, some time arriving in the very early morning hours. His job required a lot of traveling so that he was away from home frequently and the bringing up of the children was primarily upon the plaintiff's shoulders. After Brian, the first born arrived, the plaintiff quit her job.
She did do some part-time work subsequent to Brian's birth but within the next five years she had two more children and then about two years later a fourth child. At that point she became a full time homemaker.
In the meanwhile, the defendant was doing well on his job, climbing the corporate ladder. One of the plaintiff's major problems was that the defendant did not spend much time with his children and further that the plaintiff and defendant did not communicate well. She felt there was a lack of intimacy and friendship in their relationship. By 1970, the plaintiff sought help in counseling at St. Raphael's Hospital in New Haven. She attempted to have the defendant participate but he refused to go so she dropped out after two or three visits.
One of the results of the counseling sessions that the plaintiff did engage in was that she was told that she would have to work at saving the marriage. Her feelings at that time in 1970 were that she was still in love with the defendant and thought that maybe if she would have a daughter it would help the marriage. Unfortunately for the plaintiff, all the children were boys.
During the period of the 1970's she did some part-time work teaching needlework and cooking. The defendant did not seem to mind her working as long as it did not interfere with his lifestyle. Her money was used strictly as her mad money. By 1981 the defendant was transferred to DesMoine, Iowa, to supervise the district office located there.
Even though there was a change in the people he was working with, he continued the same habits relative to getting home late as he did before. This was an increased difficulty CT Page 12693 for the plaintiff because she had no family network in DesMoines to help her over the problems that she was having with the marriage.
In 1985 the defendant was transferred to the Chicago office for Aetna and the plaintiff did find that living in the Chicago area, actually St. Charles, Illinois, was easier for her than her time in Iowa. While in Chicago, the oldest child who had attended Providence College for one year, came home and attended a community college in the Chicago area. The son showed signs of depression and the plaintiff wanted to place him in counselling. Again the defendant said "no, the boy would snap out of it."
Also about that time, the plaintiff was doing some craft shows two or three times a year and made about $300 a show so she had some spending money of her own in the amount of between $600 to $1,000 per year. Even though Chicago was easier for her and she did make some friends there, the plaintiff felt that the marriage was not improving and that her relationship with the defendant was a very shallow one. Further she did not know what to do to make the marriage better.
In 1987 the defendant was transferred to New York to manage the district office there, the largest one in the country. The plaintiff claims to have been very supportive of him and proud of his achievements. At that time they had the oldest boy at George Washington University, and two children in high school. One problem for the defendant was that the parties at that time lived in Bucks County, Penn., which the plaintiff liked very much but it did entail a rather long commute for the defendant. Also, because of the long commute and because of the New York office being so busy, the defendant was tied up lots of nights at his office and as a result there was a continuation and an exacerbation of the prior situations that had prevailed in the marriage.
One of the plaintiff's objections, also, was that she was not included in the defendants social activities except for an occasional Saturday night. There was a feeling on the part of the plaintiff that the parties were not in synchronization on parenting. Another problem was on occasions, when she said no to the boys the defendant would overrule her or veto her. The defendant further seemed to feel that drinking was a right of CT Page 12694 manhood and did nothing to discourage the sons from drinking. During this period of time the plaintiff alleges there were long periods of silence between her and the defendant.
In 1990 defendant was transferred back to the home office in Hartford and had by that time attained a position as a vice president. His job in Connecticut which was called "re-engineering," was in fact, a downsizing of the company in an attempt to make it more efficient in a more competitive market. Over the years in this position he has become nationally known for his ability and his expertise in this area and has been invited to speak both nationally and internationally at different meetings conducted for the purpose of educating others in the area of "Re-engineering".
One of the difficulties in the defendant's moves within the Aetna was that frequently his transfer would occur at any time during the calendar year. When it occurred during the school year, the plaintiff was reluctant to move until the children had completed the school year. As a result there was always several months in between these transfers when the parties lived apart, so that the children could complete the school year without interrupting their education. When the defendant was transferred back to Connecticut this resulted in a six month hiatus in the marriage. It was not unusual for the defendant not to come to Bucks County for the weekend.
Defendant claims that most of his activity at night and the reason why he was not home on weekends was because of the fact that he was a workaholic and stayed on his job, which also helped him to move up to the corporate ladder and achieve the position he has now, at the time of the dissolution the of marriage. Also, he indicated he spent more times with his sons than the plaintiff credited him. At one period of time when one of the boys was in high school and playing soccer, he became the assistant coach and then the soccer coach at the high school and that he showed more interest in his sons and their progress in growing up than the plaintiff acknowledged. He claims to have taken the boys to numerous athletic events and he took them skiing frequently.
When the plaintiff came to Connecticut she lived in a condominium with the boys while the parties were building an $800,000 fourteen room home in Suffield, CT. Even the purchase and building of this large home did not do much to CT Page 12695 improve the marriage. Again, the plaintiff sought marriage counseling and again tried to get the defendant to participate. Again he refused to, saying that if she had a problem then it was hers and that he had no problems that he had to divulge to a counselor. Eventually in 1994, plaintiff commenced this action for dissolution of the marriage.
Over the years defendant has made a number of investments and has put aside money in the names of the four sons and himself and/or his wife or some of the funds were made under the Uniform Gifts to Minors Act in the State of Connecticut. The funds totaled approximately $500,000 and had been put away for both the education of the sons and when the boys married, they would have a substantial down payment for a home. Of this sum the plaintiff is claiming $100,000. Her position is that the funds were not in the children's names alone but were in CD's with her name and/or one of the sons or the defendant's name and/or one of the sons. Her position is that she had discussed these funds with her husband when two CD's worth $200,000 came due and he said that they were theirs and that in case of any future problems they would split the monies between them, the parties. The defendant denies this saying that they were solely for the benefit of the children and were not meant to be his money or his wife's money though they controlled the funds.
Throughout the marriage the defendant always managed or had control of the finances of the household and the dispersing of his income. After many arguments he finally gave the plaintiff an allowance to run the household, though he paid the major items such as mortgage, heat, utilities and taxes. She claims she herself never had a sufficient amount to develop any funds or any accounts of her own. Finances and his lifestyle and work habits were always a source of contention throughout the marriage and probably were a contributing factor to the marital breakdown.
The wife perceived the defendant as a person who always had to be in control and her desires was second to his. After moving to Suffield, defendant joined the Suffield Country Club where he played golf and again this was another source of contention because she claimed this kept him away from the home when he should have been spending more time at home with his sons and her. His perception of this relationship in a sense is different because as earlier stated he claims he took CT Page 12696 the boys to ball games and spent a lot of time with them skiing and doing other things where plaintiff did not necessarily participate with them.
Plaintiff is currently unemployed although she has done some dabbling with interior decorating in the past two years. She claims to have earned approximately $3,000 based upon a fee of $25 to $30 per hour on the jobs she done. She has taken courses in interior decorating in Massachusetts and would like to attend a program, possibly in Boston, MA., to complete her education in this area.
This is especially a difficult dissolution because defendant is having difficulty accepting the fact of the dissolution and the fact that in the State of Connecticut we have no fault divorce and as long as one party feels that the marriage is broken down irretrievably the court is bound to enter the dissolution. It is further difficult for him to comprehend that he worked very hard to achieve a certain degree of success in his profession and that this work meant that he had to labor long hours and weekends and be away from his family while traveling and also being away from his family during periods of promotion before his family could sell their homes and catch up with him. These are the very things that the plaintiff complained about when she testified. He should have seen the problems facing his marriage when the plaintiff asked him on at least two occasions to attend counseling with her. These were evidently cries for help and he ignored them or felt that she was imagining things that didn't exist.
Since this is a marriage of 31 years duration and a successful raising of the four children, the court feels it should be generous to the wife. The court will find that there has been an irretrievable breakdown to the marriage and accordingly a decree will enter dissolving the marriage. As indicated earlier all the children have attained their age of majority so there will be no custody or support issues involved herein. There remains a distribution of the marital estate and alimony.
One of the first problems that will have to be addressed in this regard is the cashing in of the two certificates of deposit that were either in the plaintiffs name and/or one or more of the children or in the defendant's name and/or in the CT Page 12697 name of one or more of the other of the children. This specifically represented $200,000 of the $500,000 that the parties indicated had been set aside for the benefit of the children. As earlier noted, some of the gifts were under the Uniform Gifts to Minor Child Act here in Connecticut but there is no representation that this particular $200,000 was specifically set aside for the benefit of the children. There was evidence by the plaintiff and denied by the defendant that he recognized that the money had not been specifically reserved for the children and indicated that in the event that anything happened in the future there would be a split of those particular funds between the defendant and the plaintiff.
The specific savings account trusts even though herein established as a fund for either the college education of the children or even for aid in helping them purchase a home in the future, consisted of funds wherein the children had no beneficial interest at the time of the dissolution. Salvio v.Salvio, 186 Conn. 311, 323. There was no evidence put on to indicate what happened with the funds after they were cashed in, except that they were still supposedly set aside for the benefit of the children but control remained with one or both of the parties. There was nothing to indicate any removal of the power on the part of the plaintiff or the defendant to cash in these funds or otherwise invade them. Accordingly, the court will find that they are part of the marital estate.
This is a rather difficult case since both of the parties are very credible persons. The difficulty arose in this particular case because the plaintiff wife understood that there were problems with the marriage very early on but stuck it out for the purpose of raising the children. The defendant never recognized the problems in the marriage and that probably was because of his desire to move up the corporate ladder and to consider himself successful in his job.
The defendant has indicated that he will retire probably around the end of November of 1995. He indicates that there will be a termination pay that should run through the end of 1996 or for approximately a 13 month period. The defendant is currently living in the home at 102 Thistle Down in Suffield, Conn. The home is currently on the market and when it is sold, the net proceeds shall be divided equally between the parties. While the defendant remains in residence with his CT Page 12698 three sons, he shall continue to pay all the expenses of the residence, including the mortgage, real estate taxes, insurance, repairs and maintenance, if any. During the period of time while the premises are still in the name of the parties, or until it is sold, the defendant will pay to the plaintiff the sum of $1,000 per week.
Following the sale of the residence, and beginning on the first day of the following month, periodic alimony shall be $8,333.33 per month through the end of December, 1996.
If there are any benefits received by the defendant in his severance package from Aetna Life Casualty Co., other than his salary, the defendant shall share equally with the plaintiff one-half of any of the benefits received, including cash, stock options, future compensation, etc. The defendant shall maintain the plaintiff's health insurance for the next three years under the provisions of COBRA which means that the plaintiff will have to pay her share of the health benefits premiums.
The plaintiff shall be named the beneficiary of the first three hundred thousand dollars of the defendant's existing life insurance and he will provide her annually with proof that such coverage remains in force.
The ISP 401(K) plan shall be divided equally amongst the parties. The defendant's pension with Aetna shall be divided equally by a Qualified Domestic Relations Order and the plaintiff shall be the surviving spouse of such plan. It has come to the attention of the court that under the Aetna Qualified Domestic Relations Order only the first $150,000 of earnings are covered which means that there will have to be another order to cover the surviving spouse for any amounts in excess of the $150,000 per year, the amount above stated. Current stock options with Aetna Life Casualty Co. shall be divided equally. Although these options have no immediate value, unless exercised, and exercising the options is dependent upon the current market value of the stock, the defendant shall provide the plaintiff an authorization to obtain the options or to exercise them on her behalf and shall also obtain other financial information from Aetna.
Returning to the $200,000 that was mentioned earlier, the plaintiff shall be entitled to her share or $100,000 of said CT Page 12699 $200,000 less $17,000 that she withdrew from said accounts on her own while this matter was pending. The court will further order that the plaintiff will pay $1.00 per year alimony commencing on the date of the dissolution to the defendant. The plaintiff has been doing interior design work and at some point in time may become a full time interior designer. In the event that she earns in excess of $25,000 per year as an interior designer, then and in that event the alimony award to the defendant shall be increased from $1.00 per year to at least $100 per week or any such modification as may be made by the court at that time.
Further, the defendant is in an excellent position to earn large sums of money as a consultant if he decides to stay in the area of re-engineering. Since he is one of the leading re-engineers in the country it is very possible that as a consultant he can make substantial monies after January 1st of 1997. Accordingly, he is ordered to pay $1 per year alimony to the plaintiff commencing January 1, 1997. The parties shall exchange tax returns annually as they become available. The plaintiff can then seek an increase in her alimony also, if the defendant earns in excess of $25,000/year. In both cases, alimony to either party shall terminate upon their reaching age 65.
There is substantial personal property, including antiques, personal jewelry, furniture, small savings and checking accounts and motor vehicles existing at the time of the dissolution. The parties have assured the court that they will be able to workout a suitable division of this property so no orders will be entered at this time with the reservation that if a problem occurs in the division of these assets, the parties can return to the court for its intervention and help in dividing these assets.
Accordingly orders shall be entered in accordance with the above stated findings of the court.
KLINE STATE TRIAL REFEREE CT Page 12700